## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SURFACES, INC., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| POINT BLANK ENTERPRISES, INC., ) | |
| MICHAEL FOREMAN, ) | |
| TRIGON INTERNATIONAL, INC., and ) | |
| CENK TUNCAY, ) | |
| ) | |
|     Defendants. ) | |

### VERIFIED COMPLAINT

Plaintiff Surfaces, Inc. ("Surfaces"), through counsel, brings this action against Defendants Point Blank Enterprises, Inc. ("Point Blank"), Michael Foreman, Trigon International, Inc. ("Trigon"), and Cenk Tuncay (collectively, "Defendants"), seeking to enjoin Defendants from utilizing Surfaces' trade secrets, as described below, to recover damages arising from Defendants' wrongful actions and misappropriation of Surfaces' trade secrets, and alleges as follows:

### THE PARTIES

1.    Surfaces is a Delaware corporation with its principal place of business in California.

2.    Point Blank is a Florida corporation with its principal place of business at 2102 SW 2nd Street, Pompano Beach, Florida 33069.

3.    Foreman is Point Blank's executive vice president and, upon information and belief, resides in the State of Florida.

4.    Trigon is a New York corporation with its principal place of business in New York, New York. It also has offices at 1643 Brickell Ave. Ste 1902, Miami, Florida 33129.

5.      Tuncay is Trigon's President and, upon information and belief, resides in the States of New York and Florida.

## JURISDICTION AND VENUE

6.      The Court has personal jurisdiction over Defendants under Fla. Stat. § 48.193 because they operated, conducted, engaged in and/or carried on businesses or business ventures in the State of Florida and committed tortious acts in the State of Florida.

7.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Surfaces has different citizenship than all Defendants.

8.      This Court has federal question jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1331 because Surfaces is asserting claims under 18 U.S.C. § 1030 *et seq.* and 18 U.S.C. § 1836 *et seq.*

9.      This Court has supplemental jurisdiction as to the remaining claims asserted in this Complaint because they relate to the claims over which the Court has original federal question jurisdiction. 28 U.S.C. § 1367.

10.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Surfaces' claims occurred in this district and, upon information and belief, all defendants are residents of the State of Florida and at least one defendant resides within the Southern District of Florida.

## FACTUAL BACKGROUND

11.      Formed in September 2020, Surfaces is a communications technology company based in California.

2

12.     Specifically, Surfaces discovered the field of surface plane magnetics ("SPM") which transmits data by sending an oscillating magnetic field along the surface of objects such as pipes, roads, structures, towers, and water.

13.     Surfaces developed SPM technology to supplement airwave wireless communication such as 5G. While airwave wireless is ideal for long distance communications, SPM is better suited for short haul wireless communication such as Bluetooth, WIFI, Zigbee, etc.

14.     In such short distance communications, airwave wireless may require an unobstructed line of sight between the sender and receiver. In this context, however, physical obstructions do not pose a problem for SPM communications because the transmitter and receiver are only required to be in contact with a surface to share information.

15.     In or around December 2019, Surfaces' predecessor corporation, Pabellon, Inc., entered a business relationship with Trigon under which the latter entity would provide Pabellon with funding and help Pabellon find potential business partners/joint venturers to develop applications for its technology. In return, Trigon would acquire global sale and distribution rights with respect to certain Surfaces product lines.

16.     In or around December 2019, Trigon executed a mutual non-disclosure agreement with Pabellon, under which it agreed:

      a.     That Pabellon remained the owner of its confidential information;

      b.     To hold Pabellon's confidential information in confidence and to take precautions to protect such information with the same level of care that it would employ with respect to its own confidential information;

      c.     Not to divulge Pabellon's confidential information to any third parties without Pabellon's consent;

      d.     Not to use Pabellon's confidential information for any purpose other than to evaluate its business relationship with Pabellon;

      e.     Not to copy, reverse engineer, disassemble, or attempt to derive the composition of Pabellon's confidential information;

      f.     To return any tangible materials embodying Pabellon's confidential information immediately upon Pabellon's request.

17.     In or around December 2019, Tuncay, Trigon's President, began pressing Pabellon to meet with a potential client, Point Blank. Tuncay invited Foreman, Point Blank's executive vice president to California to meet with Pabellon's team and discuss potential business prospects.

18.     In or around late December 2019, Pabellon's CEO, Alex Rubin, met with Foreman to discuss potential business ventures. After this meeting, Foreman sent Rubin the following email on December 29, 2019:

> *Alex*
>
> *Thank you for taking the time to share the technology that you have developed, quite impressive. We look forward to seeing how we can enhance our products that save lives. You are obviously a brilliant man and your future will be amazing.*
>
> *We are eager to demonstrate a prototype that can included in our body armor to achieve options such as the ability to measure moisture content, GPS locator, and Officer vital signs. The other item of interest would be the ability to a film over our hard armor plates that could measure if the plates had been fractured or compromised.*
>
> *It was wonderful to see your home and property, it is beautiful what you have built there.*
>
> *Happy New Year*
>
> *Mike*

19.     In or around January 2020, Pabellon signed an agreement under which it "grant[ed] exclusive and worldwide sales rights to Trigon to act as agent/distributor of Pabellon for all [SPM] technologies with" certain exceptions.

20.     Additionally, on or about January 20, 2020, Pabellon, Trigon, and Point Blank met at the 2020 Shot Show in Las Vegas, Nevada. Several members of Point Blank leadership were in attendance.

21.     To assist Tuncay in brokering communications between Pabellon and potential clients, Pabellon gave Tuncay a demonstration kit, which was meant to showcase its latest technology - a bidirectional radio-silent communication system.

22.     The demo kit included the following components: two transceivers (an alias transmitter and a receiver), which fed text information to a display (*e.g.*, a laptop). Each transceiver consisted of a Texas Instruments commercial developer's kit that had been modified to bypass the instrument's radio frequency antenna so that it could interface with a proprietary resonator. The modifications Pabellon made to the Texas Instruments kit and the resonators were proprietary. Further, while the Texas Instruments kit was used for communications protocols, the interface between the modified kit and modified antenna constituted a trade secret belonging to Pabellon developers.

23.     The demo kit was Pabellon's (and, by extension, Surfaces') most critical and valuable piece of intellectual property and represented the culmination of more than 8 years of hard work, multi-person research, and development.

24.     In February 2020, Rubin met with Tuncay at a restaurant in Miami, Florida. By this point, Tuncay had not successfully facilitated any transactions between Pabellon and potential customers, and no active negotiations were in progress.

5

25.     On August 28, 2020, Pabellon's board of directors passed a unanimous resolution to administratively dissolve the corporation because of a dispute involving a joint venture.

26.     As part of Pabellon's dissolution, all equipment, demo kits, and miscellaneous hardware were transferred to Surfaces.

27.     From Rubin and Tuncay's meeting in February 2020 to Pabellon's dissolution in August 2020, Pabellon had virtually no contact with either Tuncay or Trigon. By the time of its dissolution, Pabellon had not procured any potential clients, partners, or business relationships through its brokerage arrangement with Trigon.

28.     On September 11, 2020, Sandie Robinson, a former Pabellon director, emailed Tuncay to tell him that Pabellon had been dissolved.

29.     On September 13, 2020, Tuncay responded that he was saddened by the news of Pabellon's dissolution and stated that he had been in discussions with the Indian and Turkish governments about possible applications for Pabellon's technology.

30.     In the same email, Tuncay indicated that Point Blank had expressed interest in using Pabellon's SPM technology in the development of several thousand body armor vests to be used by law enforcement officers.

31.     Upon information and belief, Tuncay had given the demo kit he received from Pabellon to Point Blank.

32.     Consistent with its normal practices and industry custom, Pabellon loaned the demo kit to Trigon with the understanding that it would maintain custody of the equipment until instructed otherwise.

33.     Trigon was not permitted to transfer the kit to other parties and doing so constituted a serious breach of standard intellectual property protocols.

34.     On September 13, 2020, Rubin emailed a response to Tuncay, acknowledging that closing Pabellon was a disappointing but necessary act. Rubin advised further that a dedicated team would be continuing Pabellon's work and that he and Mike Simon (a Pabellon and Surfaces founder) held patents to Pabellon's valuable intellectual property.  Rubin concluded this email with the following proposal:

> Going forward: I would suggest that if a specific monetizable solution is found for a specific customer (or product line), that a productization/production company be created for that exclusive purpose (E.g Last Corner India Connectivity Inc). This of course is all contingent of up front funding as there is no wiggle room for either development or productization at this point. Conference calls and powerpoint overviews is the most possible at this juncture.

With this message, Rubin made clear that his team did not want to continue working under an agreement that granted Trigon exclusive distribution rights with respect to all SPM technologies in exchange for the extremely limited brokerage services that Trigon had been providing. Rubin proposed instead that, going forward, Trigon and Pabellon's successor entity negotiate exclusivity agreements on an account-by-account basis.

35.     On September 30, 2020, Foreman emailed Rubin and Robinson, suggesting that the parties have a Zoom call to discuss "the way forward with Pabellon Power technology and Point Blank." Rubin responded by proposing that the parties participate in a "tech session" to discuss product selection and development and a "business session" to discuss (among other things) productization, distribution strategy, and revenue models. Foreman agreed to the proposal and the parties subsequently scheduled the proposed meetings for October 12 and 13, 2020.

36.     On October 7, 2020, Robinson emailed Foreman a PowerPoint document entitled "Surfaces/Point Blank Venture Presentation." The presentation identified the objectives of the proposed joint venture to include "grow[ing] protective vest sales through 'smart' sensory and

communication enhancement features" and exploring "[n]ew market opportunities beyond vests[.]"

37. The presentation also proposed a "[p]artnership between Surfaces, Inc. & Point Blank & affiliates to leverage exclusive radiosilent technology to create and offer game changer product lines."

38. In addition, the presentation included a visual demonstration of the product that Surfaces and Point Blank were planning to develop through their partnership: a protective vest with an attached sensor or transmitter unit that could be used to communicate with a remote device up to 500 meters away.

39. On October 13, 2020, Robinson forwarded the presentation to Tuncay.

40. Foreman emailed Rubin on October 13, 2020, proposing certain topics for the parties' virtual conference call, including what technology Surfaces had available for use at that time; whether Surfaces' technology could be used in other applications beyond body armor; the sensor's size, GPS capability, and development cost; how long the sensor could be used before needing to be recharged, how long it would take to recharge the sensor, and how long the sensor could be used before requiring replacement; and any other information that would highlight the value of Surfaces' technology.

41. On October 14, 2020, Robinson emailed Tuncay asking him to sign a non-disclosure agreement ("NDA") under which he would promise to hold Surfaces' confidential information in confidence and take precautions necessary to protect such confidential information. Tuncay did not respond to this request.

42. On October 16, 2020, Robinson sent Tuncay an updated Surfaces Sales agreement which honored the terms of the parties' previous contract as to the products the Surfaces team

intended to develop in concert with Point Blank *only*. The proposed agreement was consistent with Rubin's earlier proposal that the parties address Trigon's exclusive distribution rights on a case-by-case basis rather than through a blanket exclusivity agreement.

43.    On October 16, 2020, Rubin received an email from Foreman indicating that Point Blank was negotiating with Surfaces *through* Trigon. In the same email, Foreman said he had received word that Trigon and Surfaces had not yet reached an agreement as to Trigon's brokerage services and sales rights. Accordingly, Foreman advised that Point Blank would be tabling negotiations with Surfaces until Trigon and Surfaces executed a contract between each other.

44.    On the same day, Rubin responded to Foreman in an email, informing him that Surfaces and Trigon were in fact negotiating a new agreement and that Surfaces would be "honoring the Trigon-Pabellon prior exclusivity of representation re [Point Blank]."

45.    Tuncay then emailed Rubin, stating his position that the agreement with Surfaces should grant Trigon "worldwide exclusive sales/distribution" rights with respect to all product lines developed by Surfaces.

46.    In response, Rubin stated that Surfaces would not agree to global exclusivity with Trigon and that exclusivity arrangements would be "accounts-based only." In addition, Rubin advised that if Tuncay considered worldwide exclusivity "a dealbreaker," the brokerage and distribution arrangement between Surfaces and Trigon would have to be terminated. Tuncay did not reply to this email.

47.    Apparently in response to the stalled negotiations between Surfaces and Trigon, Foreman emailed Rubin on October 16, 2020, reiterating that Point Blank would be putting its business discussions with Surfaces on hold until Surfaces and Trigon reached an agreement.

48.    Rubin then told Foreman that this was "no problem" and requested only that Point Blank return Surfaces' demo kit.

49.    In response to this email, Foreman asked Rubin to confirm Surfaces' "ship-to" address.[1]

50.    On October 16, 2020, Robinson attempted to address Tuncay's concerns about the Surfaces-Trigon contract by revising it to clarify that Trigon would be granted exclusive distribution rights with respect to products developed by the Surfaces-Point Blank partnership (as this was the only account that Trigon/Tuncay had successfully brokered on Pabellon's or Surfaces' behalf). Robinson also provided Foreman confirmation of Surfaces' shipping address. Tuncay did not respond to this email, but Foreman thanked Robinson for providing Surfaces' shipping address.

51.    On the same day, Robinson emailed Tuncay in a separate chain expressing Surfaces' willingness to "update" the Surfaces-Trigon agreement to further clarify Trigon's exclusive distribution rights with respect to products generated by the Surfaces-Point Blank partnership. In a later email (sent the same day), Robinson asked Tuncay to convey his plans to Surfaces concerning the parties' agreement by the following day (October 17) at 7 a.m. PT. Tuncay did not respond to this email.

52.    On October 19, 2020, Surfaces learned that Point Blank had delivered Surfaces' demo kit to Trigon in violation of its previous agreement to return the equipment, the rightful owner of the equipment.

53.    Upon information and belief, Tuncay privately directed Foreman and/or Point Blank to deliver the demo equipment to him, rather than Surfaces.

---

[1] The parties had previously planned to have Forman come to California to meet with Surfaces representatives personally and to hand-deliver the kit during the meeting. However, Point Blank was required to cancel the visit because of a scheduling conflict.

54.     Robinson thus emailed Tuncay again requesting his thoughts on Surfaces' proposed agreement granting Trigon exclusive sales/distribution rights with respect to Surfaces-Point Blank products *only*. Robinson further advised that Surfaces had learned that Point Blank had delivered the demo equipment to Trigon and asked Tuncay to explain his intentions concerning Surfaces' valuable intellectual property. Robinson concluded her email by asking Tuncay to participate in a phone call with her and Rubin so that the parties could "discuss what is going on." Tuncay did not respond to this email.

55.     Accordingly, on October 20, 2020, Robinson emailed Foreman and Tuncay demanding the immediate return of the demo equipment. Robinson's email further advised that if Point Blank and/or Trigon failed to promptly return the demo kit, Surfaces, its owners, and its business partners would suffer irreparable harm.

56.     Tuncay did not respond to Robinson's email. However, Foremen provided following reply only hours later:

*Sandie and Alex*

*Respectfully, this is an issue between Pabellon Power / Surfaces and Trigon International. Cenk Tuncay introduced me to Pabellon Power with the hope that your technology could be incorporated into body armor. I have attempted to communicate with all parties how this concept could be potentially incorporated into our armor and beneficial to law enforcement if you were able to prove the concept. Other than verbal concept and PowerPoint presentations we do know if this will or can be achieved.*

*It is my understanding that test equipment was delivered to Trigon International for other application. Point Blank has no other interest in the other application and the test equipment has no application to body armor. I am not part of Trigon International and the test equipment provided to Trigon International serves no purpose to me. This is strictly a matter between Trigon International and Pabellon Power.*

*I am intrigued by the concept of your technology and hopeful that you can come to a positive resolution with Trigon International. I am requesting that you do not engage me in our contract or legal negotiations with Trigon International.*

*I sincerely wish all parties the best in this matter.*

*Respectfully*

*Mike*

57.     Rubin and Robinson then attempted to schedule a phone call with Tuncay. Tuncay initially did not respond to the invitation, but did email Robinson on October 21, 2020, apologizing for missing her "call invite" and advising that he had been traveling. Tuncay also asked whether Rubin and Robinson would be available for a discussion the following week.

58.     Robinson replied the same day that she and Rubin would be available for a phone call but requested an immediate response regarding the NDA that Tuncay had failed to execute, his feedback to Surfaces' proposed agreement with Trigon concerning the Surfaces-Point Blank product lines, and Surfaces' request for the prompt return of its demo equipment.

59.     Tuncay replied by indicating that the parties could discuss those matters the following week.

60.     On October 22, 2020 (the following day), Robinson replied to Tuncay's email by demanding an immediate response to her inquiries regarding the NDA and the Surfaces-Trigon agreement with respect to the Surfaces-Point Blank account. Robinson also demanded that Tuncay provide shipment information for the return of Surfaces' demo equipment no later than the end of the day. Tuncay did not reply to this email.

61.     To date, neither Trigon nor Point Blank has returned the demo kit to Surfaces, the rightful owner of the equipment.

62.     As a technology services company, Surfaces' most valuable asset is the technology it discovers and develops. These technological innovations derive independent economic value from not being generally known to persons and/or entities outside of Surfaces.

63.     The demo kit had been designed to distill and simplify Surfaces' intellectual property. Its purpose was to demonstrate for Surfaces' customers and potential business partners how its patented SPM technology works and its many beneficial applications.

64.     As such, the demo kit contains Surfaces' confidential proprietary information.

65.     Surfaces expended significant resources, time, and labor developing and maintaining this confidential information.

66.     A significant portion of the confidential information contained within the demo kit is packaged in a small plastic enclosure that may be reverse engineered by known and pervasive pirating methods.

67.     Further, there are no known methods that can prevent the reverse engineering of Surfaces' trade secret information if the demo kit is radiographed or ultrasonically imaged.

68.     The demo kit is, however, constructed specifically to occult design details that would compromise the secrecy of Surfaces' intellectual property (provided that the equipment is not tampered with through disassembly).

69.     As Surfaces' (and previously, Pabellon's) broker, Trigon was expected to comply when Surfaces demanded the kit's return.

70.     If the confidential information embodied in Surfaces' demo kit were to become publicly available, it would severely compromise Surfaces' "first-to-market" strategy, damage investors' confidence in the marketability of Surfaces' product lines, and prevent Surfaces from realizing the monetary fruits of the technology it developed. Accordingly, the many years that Surfaces invested in developing SPM will be squandered if Tuncay, Trigon, Point Blank, and/or Foreman are not ordered to return the demo equipment immediately.

## COUNT I

**BREACH OF IMPLIED CONTRACT – CLAIM BROUGHT AGAINST TRIGON**

71.     Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

72.     In order to benefit from the brokerage-distribution arrangement describe above, Surfaces entrusted its demo kit to Trigon's care to better enable Trigon (and Tuncay) to locate suitable customers and business partners for Surfaces' technology. The demo kit contained Surfaces' confidential proprietary information.

73.     By providing its confidential proprietary information and upon Defendant's acceptance of such information, Surfaces, on the one hand, and Trigon, on the other hand, entered into an implied contract whereby Trigon understood that it had been provided the demo kit for the limited purpose of selling Surfaces' technology to potential customers and business partners.

74.     The parties impliedly agreed further that Trigon would take reasonable steps to safeguard and secure Surfaces' confidential proprietary information and return the demo kit upon Surfaces' demand.

75.     Without such an implied contract, Surfaces would not have disclosed its confidential proprietary information to Trigon.

76.     Trigon breached its duty and implied promise to Surfaces by (1) failing and refusing to return the demo kit after multiple demands by Surfaces and, upon information and belief, (2) using and/or threatening to use Surfaces' confidential proprietary information without its consent.

WHEREFORE, as a result of Trigon's breaches and other misconduct described herein, Surfaces suffered and will continue to suffer actual damages including, but not limited to, the release of its confidential information, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses. Surfaces seeks damages for its economic and non-economic

losses, its costs and attorneys' fees incurred herein, and such other and further relief as the Court may deem just and equitable.

## COUNT II

**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT – ACTION FOR INJUNCTION**

77.     Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

78.     This count is brought pursuant to Fla. Stat. § 688.001, *et. seq*.

79.     Surfaces' demo kit consists of its confidential and proprietary technical information. The demo kit constitutes a "trade secret" as that phrase is defined Fla. Stat. § 688.002(4) because it contains information (including formulae, programs, methods, processes, etc.), which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

80.     Surfaces made reasonable efforts under the circumstances to maintain its trade secrets.

81.     Surfaces has repeatedly demanded that Defendants return its demo equipment.

82.     Defendants have failed and refused to return Surfaces' demo kit and the trade secret information contained therein.

83.     The use or impending use of this trade secret information by Defendants is without Surfaces' express or implied consent.

84.     Upon information and belief, Defendants used improper means to acquire knowledge of Surfaces' trade secret information because Surfaces repeatedly demanded the demo kit's return.

15

85.     To the extent that any trade secret information misappropriated by Defendants has not already been used or disclosed, the continued possession of this information by Defendants under the circumstances described herein constitutes "threatened" use or disclosure within the meaning of Fla. Stat. § 688.003(1).

86.     Surfaces will be irreparably harmed by the use or disclosure of the trade secret information that Defendants are wrongfully refusing to return.

87.     Surfaces has no adequate remedy at law to protect it from the misappropriation and use or disclosure of its trade secrets by Defendants.

88.     Upon information and belief, the acts of misappropriation described herein were committed in a willful and malicious manner, and Surfaces is therefore entitled to an award of its attorneys' fees pursuant to Fla. Stat. § 688.005.

WHEREFORE, Surfaces respectfully requests that this Court (i) grant preliminary and permanent injunctive relief against Defendants, (ii) order a return of all trade secret information to Surfaces, (iii) allow an inspection of Defendants' computers to determine whether Surfaces' trade secret information has been disseminated or copied, (iv) award Surfaces its reasonable costs and attorneys' fees incurred in bringing this action, and (v) enter such and other further relief as the Court may deem just and equitable.

**COUNT III**

**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT – ACTION FOR DAMAGES**

89.     Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

90.     This count is brought under Fla. Stat. § 688.001, *et. seq*.

91.     Surfaces' demo kit consists of its confidential and proprietary technical information.  The demo kit constitutes a "trade secret" as that phrase is defined Fla. Stat. §

688.002(4) because it contains information (including formulae, programs, methods, processes, etc.), which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

92.     Surfaces made reasonable efforts under the circumstances to maintain its trade secrets.

93.     Surfaces has repeatedly demanded that Defendants return its demo kit, which embodies Surfaces' trade secret information.

94.     Defendants have failed and refused to return Surfaces' trade secret information.

95.     The use or impending use of this trade secret information by Defendants is without Surfaces' express or implied consent.

96.     Upon information and belief, Defendants used improper means to acquire knowledge of Surfaces' trade secret information because Surfaces repeatedly demanded the demo kit's return.

97.     Upon information and belief, Defendants have used or disclosed Surfaces' trade secret information to obtain for themselves an economic benefit.

98.     Upon information and belief, the use or disclosure of this trade secret information by Defendants has caused and/or will cause Surfaces to sustain an actual loss and Defendants will be unjustly enriched thereby.

99.     The acts of misappropriation described herein were committed in a willful and malicious manner, and Surfaces is therefore entitled to an award of its attorneys' fees pursuant to Fla. Stat. § 688.005.

WHEREFORE, Surfaces respectfully requests that the Court (i) award damages in favor of Surfaces and against Defendants for the actual losses caused by the misappropriation, (ii) award damages in favor of Surfaces and against Defendants for the unjust enrichment caused by the misappropriation, (iii) award Surfaces its reasonable costs and attorneys' fees incurred in bringing this action, and (iv) enter such and other further relief as the Court may deem just and equitable.

## COUNT IV

### VIOLATION OF FEDERAL DEFEND TRADE SECRETS ACT OF 2016

100.    Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

101.    This count is brought under 18 U.S.C. § 1836, *et seq*.

102.    The demo kit contains "trade secrets" within the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1839(3). These trade secrets consist of business, scientific, technical, and/or engineering information, including designs, prototypes, program devices, processes, etc., and:

      a.    Surfaces took reasonable measures to keep such information secret; and

      b.    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

103.    The trade secrets contained within the demo kit were used, or intended for use in, interstate commerce.

104.    Defendants acquired Surfaces' trade secret information by improper means in that Surfaces has repeatedly requested the demo kit's return and Defendants have failed and refused to

comply with these requests. Defendants therefore know that they are no longer entitled to possession of the demo kit or the trade secret information contained therein.

105.    Upon information and belief, Defendants are using and/or disclosing Surfaces' trade secret information and acquired knowledge of Surfaces' trade secrets through improper means.

106.    These improper means include, without limitation, Defendants' wrongful retention of Surfaces' demo kit and, upon information and belief, Defendants' breach of their duty to maintain the secrecy of Surfaces' trade secret information.

107.    Upon information and belief, Defendants are using and/or disclosing Surfaces' trade secret information despite knowing that they acquired access to the trade secret information under circumstances giving rise to a duty to maintain its secrecy and limit its use.

108.    Upon information and belief, Defendants took Surfaces' trade secret information with the intent to temporarily or permanently deprive Surfaces of its rights in the trade secrets and to appropriate the trade secrets to their own use.

109.    Defendants' continued possession and/or use or threatened use of Surfaces' demo kit constitutes a misappropriation of Surfaces' trade secrets.

110.    Defendants' misappropriation of Surfaces' trade secrets was willful and malicious.

111.    Defendants' misappropriation of Surfaces' trade secrets has caused and will cause irreparable harm to Surfaces.

112.    Surfaces has been injured and has suffered damage due to Defendants' continued possession, misappropriation, and use or threatened use of its trade secrets.

WHEREFORE, Surfaces requests a judgment in its favor and against Defendants pursuant to 18 U.S.C. § 1836(b)(1) for money damages, exemplary damages, and interest, costs,

attorneys' fees and all other and further relief that this Court deems just. Surfaces further requests judgment preliminarily and permanently enjoining Defendants from using or disclosing its trade secrets and requiring Defendants to return the trade secrets to Surfaces.

<u>**COUNT V**</u>

**CIVIL CONSPIRACY TO CONVERT PROPERTY AND TO MISAPPROPRIATE TRADE SECRETS**

113.   Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

114.   Upon Surfaces' demand for the return of its demo kit, Defendants had no right to continued possession or use of the equipment.

115.   Upon information and belief, Defendants combined, associated, agreed, mutually undertook, and acted in concert for the unlawful purpose of misappropriating Surfaces' trade secrets, interfering with its business relationships, and converting its property.

116.   Upon information and belief, Defendants committed acts in pursuance of the conspiracy in that:

> a.   Tuncay/Trigon directed Foreman/Point Blank to defy Surfaces' request for the return of its demo equipment and to deliver the demo equipment to Tuncay/Trigon instead.

> b.   Foreman/Point Blank agreed to wrongfully withhold Surfaces' demo kit— despite Surfaces' specific request for its return—and to deliver the equipment to Tuncay/Trigon instead.

117.   Surfaces has been and continues to be injured by the conspiracy in its trade, business, and profession. Among other damages, Surfaces has lost business as a direct result of the theft of its trade secrets and confidential business information. Further, Surfaces has suffered consequential injuries as a result of the conspiracy. Surfaces' consequential injuries include,

without limitation, the attorneys' fees and expenses involved in the prosecution of this action, loss of goodwill, and other lost earnings.

WHEREFORE, Surfaces respectfully requests that the Court (i) award damages in favor of Surfaces and against Defendants for the actual losses caused by Defendants' conspiracy, (ii) award damages in favor of Surfaces and against Defendants for the unjust enrichment caused by the conspiracy, (iii) award Surfaces its reasonable costs and attorneys' fees incurred in bringing this action, and (iv) enter such and other further relief as the Court may deem just and equitable.

## COUNT VI

### CIVIL SEIZURE UNDER THE DEFEND TRADE SECRETS ACT

118. Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

119. Under the Defend Trade Secrets Act, an owner of a trade secret that is misappropriated may bring a civil action to seize and/or enjoin the further disclosure of that trade secret if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

120. The Defend Trade Secrets Act empowers the Court to seize trade secrets upon *ex parte* application, in extraordinary circumstances, when necessary to prevent the propagation or dissemination of the trade secret. The allegations made herein demonstrate extraordinary circumstances sufficient to support an *ex parte* application.

121. The statute authorizes the Court to issue an order for civil seizure if the following requirements are met:

(I) an order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief would be inadequate to achieve the purpose of this paragraph because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

(II) an immediate and irreparable injury will occur if such seizure is not ordered;

(III)    the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

(IV)    the applicant is likely to succeed in showing that—

(aa)    the information is a trade secret; and

(bb)    the person against whom seizure would be ordered—

(AA)    misappropriated the trade secret of the applicant by improper means; or

(BB)    conspired to use improper means to misappropriate the trade secret of the applicant;

(V)    the person against whom seizure would be ordered has actual possession of—

(aa)    the trade secret; and

(bb)    any property to be seized;

(VI)    the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, identifies the location where the matter is to be seized;

(VII)    the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person; and

(VIII)   the applicant has not publicized the requested seizure.

122.    An order issued pursuant to Rule 65 would be inadequate because Defendants would evade, avoid, or otherwise not comply. The allegations set forth in this Complaint demonstrate that Defendants have consciously, purposefully, consistently, and wrongfully deprived Surfaces of its proprietary demo kit and the trade secrets embodied therein. Defendants

have failed and refused to grant Surfaces access to its property despite Surfaces' repeated requests for the demo kit's return.

123.    Surfaces will suffer immediate and irreparable injury if the demo kit is not seized. As set forth more fully in the paragraphs above, the demo equipment embodies Surfaces' core intellectual property—namely, technology that utilizes physical surfaces for bidirectional radio-silent communication. This technology derives its value from not being generally known. It has now fallen into the hands of unscrupulous individuals and entities who, upon information and belief, wish to pirate, replicate, copy, and/or reverse engineer Surfaces' proprietary information for their own commercial advantage. The rewards of Surfaces' many years of hard work will be severely diminished if it is not the first to market its SPM technology.

124.    The harm to Surfaces of denying its application for civil seizure far outweighs the harm to any legitimate interests of Defendants in granting the requested relief. As set forth herein, Defendants have no legitimate interests in the demo kit; the equipment belongs to Surfaces and contains its valuable trade secrets. The harm to Surfaces in not ordering a civil seizure also outweighs any harm that may be sustained by third parties if the requested relief is not granted.

125.    As set forth more fully above, the demo equipment contains Surfaces' confidential proprietary information. This information constitutes "trade secrets" under the Federal Defend Trade Secrets Act (and the Florida Uniform Trade Secrets Act).

126.    At least one of the Defendants named herein is in actual possession of the demo equipment and the trade secrets embodied therein.

127.    Surfaces describes with reasonable particularity the matter to be seized, as well as the locations where it may be found, as follows:

From the offices of Point Blank, located at 2102 SW 2nd Street, Pompano Beach, Florida 33069, or Trigon, located at 1643 Brickell Ave, Suite 1902, Miami, Florida 33129, or the personal residence of Tuncay, or the personal residence of Foreman, the U.S. Marshall(s) should seize:

A bi-directional demo kit that was designed to allow radio-silent communications via text messaging. The kit consists of two transceivers—an alias transmitter and a receiver. These transceivers feed the text information to a display (e.g., a laptop). Each transceiver is comprised of a modified Texas Instruments commercial developers kit modified (RF antenna bypassed) to interface with a resonator.

Defendants will be able to identify and release the property described herein and should have no difficulty cooperating with authorities to complete the requested seizure.

128.    Defendants would destroy, move, hide, or otherwise make the demo kit and trade secrets inaccessible to the Court if notice were given. As alleged herein, Surfaces demanded the return of the demo equipment. After initially agreeing to return the kit, Defendants Foreman and/or Point Blank surreptitiously handed it over to Trigon and/or Tuncay despite knowing that it belonged to Surfaces. Trigon and/or Tuncay intercepted the demo equipment from Foreman and/or Point Blank, despite knowing that Foreman and/or Point Blank had agreed to return the kit to its rightful owner. Thereafter, Tuncay and/or Trigon continued to ignore Surfaces' written demands for the equipment's return. Weeks have passed since Surfaces initially requested the return of its property, and Defendants have yet to comply. Defendants' actions serve as evidence that they may destroy, move, hide, or otherwise make the equipment inaccessible to the Court if notice were given.

129.    Surfaces has not publicized the requested seizure of its demo kit and accompanying trade secrets.

WHEREFORE, Surfaces respectfully requests that the Court enter an Order for civil seizure of the property described in this Count and for such other and further relief as it may deem just and appropriate.

## COUNT VII

### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT

130.    Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

131.    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., permits any person who suffers damage or loss by reason of the activity prohibited by the statute to bring a civil action for damages and injunctive relief.

132.    The disputed demo kit is a "computer" within the meaning 18 U.S.C. § 1030(e)(1) because it consists of a high-speed data processing device performing logical and storage functions and includes a data storage and communications facility directly related to and operating in conjunction with it.

133.    The demo kit is a protected computer within the meaning of 18 U.S.C. § 1030(e)(2) because it is used in and/or affects interstate commerce.

134.    Upon information and belief, Defendants knowingly and with intent to defraud, accessed Surfaces' demo equipment without authorization, or exceeded their authorized access, by wrongfully retaining the equipment after Surfaces demanded its return in order to obtain and use Surfaces' valuable intellectual property and trade secret information.

135.    By means of the conduct described herein, Defendants have furthered their intended fraud and appropriated Surfaces' proprietary, confidential, and trade secret information to their own possession.

136.    Defendants' unauthorized access to Surfaces' demo equipment has caused, and will continue to cause, Plaintiffs to suffer "damages" and "losses" as those terms are defined in sections 1030(e)(8) and 1030(e)(11), respectively.

137.    The value of the information Defendants obtained through their unauthorized access to Surfaces' demo kit exceeds $5000.  Additionally, upon reacquiring its demo kit, Surfaces will have to expend significant resources assessing what (if any) proprietary information Defendants took from it, ensuring that such information has not been disseminated to third parties, and taking any necessary remedial measures.

138.    Upon information and belief, Defendants' theft of Surfaces' demo kit was intentional and was committed for purpose of commercial advantage or private financial gain.

139.    Surfaces is entitled to injunctive relief to restrain and prohibit Defendants from further violations of the Computer Fraud and Abuse Act with respect to any computerized device holding Surfaces' proprietary trade secret information and to restrain and prohibit them from further use of any data or information obtained from Surfaces through their violations of the Computer Fraud and Abuse Act.

140.    Surfaces is further entitled to recover its damages and losses incurred by reason of Defendants' violations of the Computer Fraud and Abuse Act, in an amount to be proven at trial.

WHEREFORE, Surfaces respectfully requests that the Court (i) enter judgment in favor of Surfaces and against Defendants; (ii) enter a preliminary and permanent injunction prohibiting Defendants from further violations of the Computer Fraud and Abuse Act with respect to any computerized device holding Surfaces' proprietary trade secret information and prohibiting them from further use of any data or information obtained from Surfaces through their violations of the Computer Fraud and Abuse Act; (iii) enjoin Defendants from disposing of any copies of

Plaintiff's data, files, or information; (iv) order Defendants to account for and pay as damages to Surfaces all profits and advantages gained from misappropriating Plaintiff's trade secrets and confidential information; (v) order Defendants to deliver to Surfaces all copies of its data, files, trade secrets and confidential information; (vi) award Surfaces its reasonable attorney's fees and costs incurred in prosecuting this action; and (vii) grant such other and further relief as this Court deems just and proper.

## <u>COUNT VIII</u>

### CONVERSION

141.    Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

142.    Surfaces is the rightful owner of the demo kit which Defendants are wrongfully withholding.

143.    Surfaces repeatedly demanded that Defendants return its demo equipment and Defendants refused to comply with that demand.

144.    Surfaces was entitled to possession of the demo kit upon demanding its prompt return from Defendants. Conversely, Defendants were no longer authorized to exercise possession, custody, and/or control over the demo kit upon receipt of Surfaces' demand for its return.

145.    By failing and refusing to return Surfaces' demo equipment, Defendants have deprived Surfaces of its property permanently or for an indefinite time.

146.    By failing and refusing to return Surfaces' demo equipment, Defendants, upon information and belief, intended to exercise over the property an ownership inconsistent with Surfaces' right of possession.

147.    As a direct and proximate result of Defendants' conversion of Surfaces' property for their own use, Surfaces has suffered and continues to suffer damage to its business and business interests.

WHEREFORE, Surfaces respectfully requests that the Court (i) award damages in favor of Surfaces and against Defendants for the actual losses caused by Defendants' conversion of its property, (ii) award damages in favor of Surfaces and against Defendants for the unjust enrichment caused by the conversion, (iii) award Surfaces its reasonable costs and attorneys' fees incurred in bringing this action, and (iv) enter such other and further relief as the Court may deem just and equitable.

## COUNT IX

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

148.    Surfaces adopts and realleges paragraphs 1 through 70 as if fully set forth herein.

149.    Through its legitimate business efforts Surfaces has developed economic relationships with existing and potential customers that portend the probability of future economic benefits including, but not limited to, the licensing of its SPM technology.

150.    On information and belief, Defendants have utilized Surfaces' demo kit and valuable confidential and proprietary information without authorization to illegally and improperly acquire Surfaces' customers, the economic rewards of its technological innovations, and other fruits of its many years of hard work.

151.    On information and belief, Defendants intentionally and unjustifiably interfered with and disrupted Surfaces' actual and potential business relations when they appropriated Surfaces' demo kit and trade secret information to steal its existing and probable customers so that

they, rather than Surfaces, could benefit from Surfaces' discoveries, innovations, and years of hard work.

152.    Upon information and belief, Defendants knew and were fully aware of the above-referenced business and contractual relationships at all times material hereto.

153.    Defendants' acts have caused disruption and interference with Surfaces' business and contractual relationships.

154.    Defendants' methods of interference are improper and unjustified, and, upon information and belief, Defendants' motives for interference are improper.

155.    Surfaces has suffered damages as a direct result of Defendant's wrongful and intentional interference.

156.    Defendants' wrongful interference has caused and is causing Surfaces to suffer irreparable harm.

WHEREFORE, Surfaces respectfully requests that the Court (i) award damages in favor of Surfaces and against Defendants for the actual losses caused by Defendants' wrongful interference with actual and prospective business advantage, (ii) award damages in favor of Surfaces and against Defendants for the unjust enrichment caused by the interference, (iii) award Surfaces its reasonable costs and attorneys' fees incurred in bringing this action, and (iv) enter such other and further relief as the Court may deem just and equitable.

## COUNT X

### BREACH OF THE DUTY OF LOYALTY AND FIDUCIARY DUTIES

157.    Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

158.    As custodians of Surfaces' demo equipment, Defendants held positions of trust and confidence with respect to Surfaces' property and confidential, proprietary information.

Defendants owed Surfaces a duty of loyalty and fiduciary duties with respect to such property and confidential information.

159.    By engaging in the conduct described throughout this Complaint, and upon information and belief, Defendants have breached their fiduciary duties to Surfaces by using and/or conspiring to use Surfaces' confidential and proprietary information to steal Surfaces' actual and prospective business advantages, reap the financial benefits of Surfaces' many years of hard work, and enrich themselves at Surfaces' expense.

160.    Defendants further breached their fiduciary duties to Surfaces by wrongfully keeping its property without its consent.

161.    Defendants' actions, as described herein, have caused Surfaces to incur severe injury in the form of lost property, confidential information, trade secrets, and customers, and, unless those actions are restrained, Surfaces will continue to lose revenue associated with the stolen trade secret information and lost customers.

162.    Defendants' actions, as described herein, also warrant the imposition of punitive damages under Florida law in that they show willful and intentional misconduct taken with actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Surfaces would result.

WHEREFORE, Surfaces requests that judgment be entered in its favor and against Defendants for Defendants' breaches of the duty of loyalty and fiduciary duties, and that this Court enter an Order: (1) awarding injunctive relief requiring Defendants to return Surfaces' demo equipment (and any other trade secret information); (2) restraining Defendants from using or disclosing Surfaces' trade secret information; (3) awarding Surfaces damages, including

compensatory and punitive damages; and (4) entering such other and further relief as the Court may deem just and equitable.

## COUNT XI

### ENRICHMENT WITHOUT CAUSE

163.    Surfaces adopts and re-alleges paragraphs 1 through 70 as if fully set forth herein.

164.    Upon information and belief, Defendants have wrongfully accepted and retained, and continue to accept and retain, the benefits of Surfaces' property (the demo kit) and the proprietary, confidential information and trade secrets it contains.

165.    As a result of their wrongful conduct, Defendants have been and continue to be enriched without cause at the expense of Surfaces in an amount to be proven at trial.

WHEREFORE, Surfaces respectfully requests that judgment be entered against Defendants, and in Surfaces' favor, for damages attributable to Defendants' enrichment without cause in an amount to be proven at trial, in addition to Surfaces' costs, attorneys' fees, consequential and exemplary damages, and such other and further relief as the Court may deem just and equitable.

WHEREFORE, Surfaces respectfully prays for judgment against Defendants for actual and compensatory damages; for exemplary or punitive damages for Defendants' willful and malicious conduct; preliminary and permanent injunctive relief requiring Defendants to return any and all Surfaces trade secret information and restraining Defendants from using or disclosing any of Surfaces' confidential and proprietary information; for Surfaces' reasonable costs and attorneys' fees incurred herein; and for such other and further relief as the Court may deem just and equitable.

### JURY TRIAL DEMAND

Surfaces requests a jury trial as to all issues so triable.

Respectfully submitted,


By: /s/ Alan D. Danz
ALAN D. DANZ, ESQ.
Florida Bar No. 0948934
Danz Law, PLLC
11011 Sheridan Street, Suite 314
Cooper City, FL 33026
Telephone: (954)530-9245
Facsimile: (954)616-5738
Email: danz@danzlaw.net



By: /s/ Jack McInnes
Jack McInnes (MO # 56904)
**Pro Hac Vice Forthcoming
MCINNES LAW LLC
1900 W. 75th Street, Suite 220
Prairie Village, KS 66208
(913) 220-2488
(913) 347-7333 (Fax)
jack@mcinnes-law.com

## <u>VERIFICATION</u>

Under penalty of perjury, I declare that I have read the foregoing Verified Complaint and that the facts stated in it are true and correct to the best of my knowledge and belief.

Executed on December 22, 2020.

_____ 12/22/2020
Signature

Alejandro V Rubin
_____
Printed Name

CEO
_____
Title, SURFACES, INC.